We have two cases on the oral argument calendar this morning, but there are four cases being submitted on the briefs without oral argument, and I will just note those for the record. The first case that's being submitted without oral argument is number 07-7131, Doolin v. Department of Veterans Affairs. The second case is number 07-3135, White v. Department of the Army. The third case is number 07-3214, Roberts v. Office of Personnel Management. And the third case is number – fourth case, excuse me – is number 07-3262, Malick v. Veterans Administration. Again, those cases are being submitted on the briefs without oral argument. The first case in which we'll hear oral argument this morning is number 07-1020, Degussa Corporation v. United States. And Mr. Stratford, you're representing the government, and I guess you have reserved five minutes for rebuttal. I would like that, Your Honor. I just wanted to confirm that. You can start whenever you're ready. May it please the Court. This is a pair of classification cases. But I apologize. I said you could start. I'm going to ask you a question at the start because time is so fleeting here. I'm sorry to jump on you so quickly. But in any event, as I read Judge Aquilino's opinion, okay, he seemed to agree with the government's argument in the CIT with respect to the meeting of the note and so forth. He said this was your argument. He seemed to bind your argument that these were impermissible impurities. However, he then – and I'm thinking in particular about the bottom of page 12 and the top of page 13 of his argument. As I understand it, he seems to say, well, this is not relevant because you don't look to the surface of the crystal. You don't look to what's going on on the surface of the crystal. You only look at the core of the ball. That seemed to me to be the grounds on which he decided the way he did in the case. Okay? And indeed, DeGusa, in its brief, argues this point extensively, that the surfaces are relevant. They cite testimony of various experts and so forth. What is the government's response to that argument, namely that the surface is not relevant? Because you argue extensively about what results can held under the notes and so forth. But I didn't see you – and please correct me if I'm wrong – I didn't see you really address that point, namely the argument that the surface is irrelevant. Now I'll let you go from there. Well, it's rendered basic that anything that's imported is classified and the condition is imported. And here we have a silicon dioxide that has been chemically aftertreated with the hydrocarbons and adding, in essence, impurities to the basic hydrophilic silicon dioxide. That makes the product hydrophobic and renders it particularly suitable for the – Well, I understand that's the argument that you made, and there's that interesting two-word sentence of Judge Aquilino's where he says, I concur. But the point is that DeGusa would come back and say, well, all of this goes on on the surface, and that's not relevant. What is your answer to that point? I believe, Your Honor, that in his opinion where he says, well, we aren't going to consider the surface. The bulk, in essence, of this product is silicon dioxide, and it's 99.8% silicon dioxide. But he's only looking at the inside of this particle and not the entire product because, as we point out in our blue brief – Your Honor, aren't you saying that the rules that govern in the chemistry classroom are not the same rules that govern in the chemistry classroom? That's exactly right, because in the classroom – If you look at the untreated – DeGusa's got two products, right? The untreated and the chemically aftertreated? Yeah, the untreated. The untreated product has got surface activity, right? It has silanol groups on the surface. Okay, so let's stop right there. You don't contend that that product should fall out of Chapter 28 because of that surface material, right? It does not because that's a permitted impurity within the meaning of Chapter Note 1A, and that's because – Wait, wait, wait, wait. Just stop there for a second. An impurity has to be something that results from the manufacturing process, right? Exactly. Well, when they – the stuff that comes onto the surface of the pure SiO2 doesn't come along as a result of the manufacturing process. Well, according to Judge Acalino, it does. Well, Judge Acalino may be wrong. You know as well as I do why the surface activity exists on the pure SiO2, right? It's just in – you make the stuff, and it's in a room, and there's some moisture, and all of a sudden you've got little dancing molecules on the surface, right? The – it can add additional SiO2 groups, so physically bond, but these are chemically bound. The definition of an impurity is something that has to have resulted from the manufacturing process, and they're examples, right? You know as well as I do. They're examples, and they come because of the starting materials, impurities, reagents, byproducts, et cetera. None of that is true with regard to the surface on the untreated material. It's because on the untreated, the solenoid groups are derived from the manufacturing process, as Judge Acalino quite poignantly pointed out. And if you look at the joint appendix, Your Honors, at page 710, you see the untreated silicon dioxide, and then the chemically after-treated. On the untreated, it shows surface groups, SiOH, which are the siloxane, the solenoid groups, which is the impurities we're talking about. Those come from the manufacturing process, manufacturing the basic silicon dioxide, and then you add these methyl groups or the octyl groups, which are the hydrocarbons. Well, in order to get the surface treatment, in order to make the imported product that's in soup repel water, they throw a reagent of some sort on top of it, right? It's the hydrocarbon groups. And the hydrocarbon groups are formed as a result of a reagent being thrown on the chemical. Isn't that true? They are formed, they are reagents. They don't throw hydrocarbon molecules on top of it. Isn't the reagent something else? The reagent is the methyl groups and the octyl groups. They react with the silicon dioxide, the solenoid groups, and they replace... They react with the solenoid groups, so in essence, to eat up, to erode the majority of the solenoid groups. They replace somewhere between... Well, I understand that, but the point is that they simply erase the stuff that used to be water-absorbed, even, and erode it, and consequently it's not that way in the final product. But the hydrocarbons are formed, right, as a result of throwing a reagent, if you will, on top of the chemical. The hydrocarbon groups are introduced into the... The CH3 group attaches to the silicon atom and forms what's called a silane, which is the hydrocarbon group. In other of the products, as you see from the... the different surface groups that form, it's either methyl groups of CH3 or the octyl, which is the CH17, and the hydrocarbon groups are there by covalent bonding to a silicon atom. Now what... So the hydrocarbons are in the compound, they bond into the compound? They are, they're covalently bonded, chemically bonded, so that's the reason why we say that is impurity, and because it's deliberately left in the product to render it suitable for specific use, it's impermissible then. And therefore it can't be in Chapter 28. On page 4 of our blue brief, Your Honor, we outline what it is that the hydrocarbons groups that are attached on the surface of the silicon dioxide do. And they, in essence, do four things. They prevent additional solenoid groups from forming on the particle, and therefore maintains hydrophobicity. It neutralizes or blocks some of the solenoid groups that remain on the surface. Since only 30 to 70% are replaced, there are additional solenoid groups that remain there, and those are permissible impurities because they were formed in the initial manufacture of the silicon dioxide, and they aren't left in the silicon dioxide to make it suitable for specific use. They're just there. And that's true with these other compounds in Chapter 28. You have solenoid groups on those, but they aren't left in the product to make it suitable for specific use. And they come from the manufacturing process. If the product in question, sir, had an impurity that was on the surface of the chemical, the binding bond to the surface, like the hydrocarbon bond to the surface. Yes. So if there was an impurity in the product in the suit that was permissible, then it would qualify for Chapter 28, right? If it didn't have the impermissible impurity. That's just a statement. If it were permissible. And in fact... So just, can you wait a second? So if that were true, then you would have something that at the core, in SiO2, that there was something different chemical, if you will, on the surface. But that wouldn't disqualify, right? It wouldn't disqualify. What I'm trying to get you to understand is that the fundamental rule of chemistry lab, which Aquilino thought caused the government to fail here, is a principle that I do believe is respected by the government. It's just that some impurity will fail if they have a particular, in application, have a particular impact on the product. That's right. Your Honor, in making the silicon dioxide, you have some of the aluminum that comes off of the tubes. This is a minimum amount, and that's considered a permissible impurity. And does not throw the product out of Chapter 28, because it's not left in the product to render it suitable for specific use. Does the definition of a separate chemically defined compound include permissible use, or is this a two-step analysis? Should we try to figure out first whether something is a separate chemically defined compound, and then if yes, does it have permissible or impermissible impurities? I think, probably, Your Honor, that's true. So here's my question. So in the explanatory notes for the separate chemically defined compound, it says the proportion of each element is constant and specific to each compound, and is therefore said to be stoichiometric. So my understanding of the normal silicon dioxide molecule interacting with the environment is such that you have two little things on the end that wouldn't be bonded to anybody on the exterior. So would that meet the definition? I'm talking about the natural one, not the one that has been modified in this case. But would that be stoichiometric as this definition requires? A normal molecule, because interacting with the environment, it's not going to be constant throughout, right? If you had a silicon dioxide and it has the solenoid groups on it, that strictly would not be stoichiometric and it would not be a separate chemically defined compound. But then nothing would, right? Because if we went with the idea that we took into account the surface in natural elements, then it seems like nothing could ever meet the definition of a separate chemically defined compound because the molecule is always on the surface interacting with the environment such that it's not bonded the same way as it is in the interior. Well, that doesn't apply to all of the, this chapter 28 includes elements and compounds. And not all elements and compounds have interaction with things outside the surface. Some do. Some do, the silicon dioxide does, and the iron oxide. There are several of the things. The oxides, as Professor Canary, our expert, pointed out, there are a number of them that do like that, but those, the interaction in solenoid groups forming on the surface would be permissible impurities. It would not throw it outside of the chapter 28. I know it would be permissible impurities, but that's why I asked you if it was two separate part tests. First, is it a separate chemically defined compound? Second, are there permissible or impermissible impurities? And so I'm wondering, does it meet the first prong, a separate chemically defined compound? Because if we were to consider the surface in a natural molecule of this kind, not an altered one, then it seems to me that it wouldn't be stoichiometric. So it seems to me you have to exclude the surface of an unmodified version or it could never meet the definition of a separate chemically defined compound, which can't be what was intended. There are only certain compounds and elements that have an interaction with the surface and present the problem that you have just pointed out, Your Honor. So each of those would never fall within the definition of a separate chemically defined compound? Is that what you're saying? I mean, you're saying it's not all elements. I would say for silicon dioxide, since you do have solenoid groups on the surface, strictly speaking, it's not a separate chemically defined compound and it's not stoichiometric. The interior... Why? Because customs respect the laws of chemistry. The reason why the untreated product is a separately defined compound. It's containing permissible impurities, Your Honor. Not just that it's a separate chemically defined compound. The solenoid groups on the untreated product have... You've never convinced me that the solenoid groups are formed as a result of the manufacturing process. Well, Your Honor, that's exactly what the BDUSA document here, that points us to the 19 on page 710, it shows that. This is not some silicon dioxide that's sitting around the warehouse and accumulates moisture, although it can, but in the manufacture of the silicon dioxide, it introduces some chemically bound groups and that's the solenoid groups. And it shows it right here. And which page is it? Well, page 710 of the Joint Appendix. Just show us how it's shown there. Well, up in the upper left-hand corner. Upper left-hand corner, right? You see the SIOH there? SIOH, yeah. That's the solenoid group. And then this silicon dioxide is chemically aftertreated and you wind up with this array here. So is this box describing the manufacturing process or describing the chemical once it's in a product form? Can you answer that? The way it's manufactured is a continuous manufacturing process. And you don't just manufacture, say, the untreated silicon dioxide and then throw that into a hopper and chemically treat it. It goes through one big process. And so I think it's reasonable to conclude. Solely and directly from the manufacturing process. Right. Mr. Stratford, I think you've used up your rebuttal and your rebuttal time, but you've had a number of questions from the panel. So we'll restore your full five minutes for rebuttal. Sounds like a good idea. And we'll hear from Tagusa now. Mr. Van Arn? That's correct. Good morning, Your Honor. I'm Frederick Van Arn for Tagusa Corporation. And I'd like to focus my argument this morning on Mr. Stratford's position that the silane groups on the surface of a silicon molecule, a silicon particle, are impermissible impurities. He says that the hydrocarbons that he says are added to the surface are the impermissible impurities, correct? Yes, exactly. And so that's the issue, whether that's an impermissible impurity. Weren't you responding to this most recent discussion? I'd like to respond to it two ways if I may. I'd like to look at it from the legal analysis and I'd like to approach it from factual analysis as well. Why is it that the untreated products are properly categorized in Chapter 28? Well, the untreated and the treated should both be in Chapter 28. Because if you are a scientist and you analyze what this product was, you determine that it was silicon dioxide. And the way you go about doing that is- Why are the silane groups that are on the untreated product, why are they not impurities? Because again- As defined in the note. Well, they're not impurities because they're on the surface. We're going to forget about what they are. Are they the result of the manufacturing process? No, they're the result- Or are they the result of manufacturing? No, they're not, Your Honor. They result by the laws of chemistry. Those valences have to fill. And that's what they do. They fill. And they fill by grabbing some of the existing water out there. But in order to measure whether something is an impurity, you have to ask yourself, what's it making less pure? And that's what this entire case is about, is whether or not- No, but that's not the definition for what's an impurity. The definition for what's an impurity- An impermissible impurity is when such substances are deliberately left in the product with a view to rendering it particularly suitable for a specific use. That's not suggesting that it's an impurity in the kind that I would think of, something you'd want to get rid of. You're right. I mean, this very definition permits the notion that an impurity of this kind could be something you'd actually like to have there because it is for a specific use. It's just that's an impermissible impurity. Well, Your Honor, if I may address your characterization of this as a definition, I think we're all starting from the wrong place here. It says definition of impermissible impurity, Chapter 01A. How is that a definition? Because it's an explanatory note. Now let me explain, if I may, please. This is a tariff classification case, and it involves a Tupon analysis by reviewing court. The first analysis you do is you analyze the meaning of the relevant tariff terms. Now the tariff term that is relevant here is Chapter 28, Note 1A. Now Chapter 28, Note 1A provides, and I quote, separate chemical elements and separate chemically defined compounds, whether or not including impurities. Now as a reviewing court, it's your responsibility to interpret the statute to give meaning to the legislative intent. And, of course, the first source for determining this legislative intent is the exact language that's at issue here. You can disregard the explanatory note because it's not legally binding on us. Well, I'm going to get to that and explain not only the fact that it's not legally binding. We'll get to that if we don't mind. Okay, this court, in Ruby's costume, stated that when you have an explanatory note, which has a limiting language, you cannot use that limiting language to limit the scope of a tariff provision. And that's exactly what we have here. The statute talks in terms of impurities. It doesn't make the distinction between permissible or impermissible. It simply says, do you have an element? Do you have a compound? And if you do, it stays in Chapter 28 regardless of whether there are impurities on it. That's exactly it. No, I think that possibly the reason that the explanatory note went about the process of distinguishing between permissible and impermissible impurities is because of exactly this kind of case. The kind of case where, if you look at a molecule that's interacting with the environment, it's never going to be stoichiometric all the way across. Never going to be. Couldn't possibly be, right? Because it's interacting with the environment. Granted, apparently not all molecules do such things, but all silicon dioxide would. And so as a result, they adopted this permissible-impermissible impurity language to make it clear that when you've got a pure form of the element, it's not going to have the same stoichiometric representation along the outside. And so we'll call the fact that it's not the same all the way across a permissible impurity. No, I don't believe that's what they intended. I believe they intended to look at the bulk of the particle and determine whether or not there are impurities within the bulk. And if there are, we're not going to take this product and put it in Chapter 28. We'll take it at 28 and put it in Chapter 38. I think it's important to understand that in nature, matter falls into one of two general categories. You've got pure substances on one side, which consists of elements and compounds, and on the other side, you have mixtures. And not surprisingly, the tariff reflects it. Chapter 28 covers elements and mixtures. Chapter 38 covers mixtures. So clearly, the drafters of the tariff, by using this language, Chapter 28 includes products, separate chemically defined compounds, whether or not including impurities. Chapter 38 excludes compounds whether or not containing impurities. Basically what the drafters are saying here is you have to analyze the compound, determine whether or not it's a separate chemically defined compound, and if it is, and if there are impurities present, regardless of why they're there or where they are, it stays in Chapter 28. And as a matter of law, then it can't go in Chapter 38. And of course, this continues... You're saying the notion that there could be something denominated an impermissible impurity is against the law. I'm saying that it's certainly against the Ruby's Costume decision. You cannot take limiting language. Now, why is this limiting language? Well, because the explanatory notes and the statute talk about impurities. Then the explanatory note goes further. We're going to take this class of impurities and divide it into two discrete groups, permissible versus impermissible. And Congress didn't say that in the statute. Congress says impurities. It doesn't distinguish between one and the other. So I respectfully submit that you need to give the explanatory note no way. You cannot use that limiting language to narrow the scope of the law, the law that you're here to construe. Sir, let me ask you, if I could, please, one question. You heard the discussion between Judge Clevenger and Mr. Stratford in which the proposition was offered that, yes, as a matter of chemical science, when you're determining the structure of a particular compound, you simply look to the core. You don't look to the surface. And that's reflected in expert testimony in the record. And then the thought was offered that, well, that's true, but here we're in a little bit different universe. We're in a taric universe, and Congress has made a determination with respect to impurities and so forth. What is your response to that? Because that seemed to me to be a key point in Judge Aquilino's decision. He said, look, I'm going to ignore the surface. And I think the thought and the discussion that I referred to was that, yes, that's correct in a matter of chemical science, but it doesn't apply here. What is your response to that? Well, I disagree with that, Your Honor. I think what Judge Aquilino did was he did a typical general rule interpretation of one analysis, and he was faced with the statutory language, separate chemically defined compounds, whether or not including impurities. And he construed it, and he did so to reflect its common and commercial meaning. This is what judges do all the time when they're facing these taric classification cases. Well, yeah, he said basically the surface is irrelevant. So he went and he said… Is my understanding correct? I think that's what he said, right? Yes, exactly. I agree with that, Your Honor. Okay. Now, why does that rule, which is correct, I suppose, in terms of what a chemist would say in analyzing a compound, why does that rule necessarily apply here when we're talking about a taric classification where Congress can kind of set the rules? Well, but Congress is presumed to know the rules of science and know the rules of commerce. And, again, that's black-letter customs law, that those rules are written into the taric. And all that Judge Aquino did here was he construed, I have to figure out what this product is. Is it a separate chemically defined compound? So we heard testimony. Every one of the witnesses, including the witness for the government, agreed that when we're going to determine whether something is a separate chemically defined compound, we analyze the bulk of that particle. We do not care about what's occurring on the surface. So using this as the way to construe the language of the statute, the judge said, okay, let's hear testimony. And he did the second part of his analysis where he determined that, as a matter of fact, the imported product fit within the scope of his definition of what a separate chemically defined compound is. Now, what are the provisions that's in L1A? And the government sort of – it cites it in its brief, but it's almost sort of a throwaway line, is this paragraph in Section 1A that says – and you can probably maybe address this – products with added water or pounds are, on the other hand, excluded since such agents modify the original characteristics of the product. Now, the government doesn't make much of that provision. It notes it in its brief, in the blue brief. Is that – what relevance of any does that have? It has no application to this case. The government has tried to make some sort of fine line between hydrophilic material and hydrophobic material. But hydrophobic doesn't mean that it's a water repellent. That's a totally different thing. And if you look at the surface of the hydrophobic material, you're going to have hydrophilic qualities and hydrophobic qualities. It's not water repellent. It simply means something is hydrophobic. If you agree that if it was water repellent, this provision would be pertinent. Yes, exactly. If this was water repellent, then this provision would be pertinent. But it's not a water repellent. It would help. Excuse me? It would help. It would help the government, yes. But it's not a water repellent. The provision in Chapter 28 is applicable. What is the purpose of treating the product that you will see? Well, they treat the product so that they can create different grades of silk and dioxide. Different customers have different applications. So, like, tell me what the other application is. Isn't it true that the product suit is, if you will, unfriendly to water? The product suit, yes, has an affinity towards oil and an aversion to water. But that doesn't mean that you can't put it in a water application. Nor does it mean that a hydrophobic product can't be put in an oil-based application. And there are all kinds of decisions that can be made. But it might suggest that it's, quote, water repellent, close quote, wouldn't it? But it's not water repellent, Your Honor. In fact, at trial, an example was shown where a, quote, hydrophobic product sank in water. And yet when they added oil to it, it gravitated to the oil space. Because, again, you have to view the hydrophobic, hydrophilic in context of the liquid phase. The hydrophobics prefer oil. And so if you were using a reaction where you had an oil-based application, you perhaps would prefer hydrophobic. But let's say you're doing something where the liquid is a water-based or alcohol or something else where the liquid is polar and there's an oxygen molecule in the middle. Now, are you going to prefer to have something that's hydrophilic? I just also want to point out that there was a period of time— Isn't the use of silanes generally a way of rendering a product hydrophobic? What the silanes do is simply go and they lop off one of those oxygen atoms and— Aren't they generally used for the purposes of rendering a product hydrophobic? It's used, yes. It's used to create products that have hydrophobic characteristics. Why doesn't that equal water-repellent? I'm just having trouble— But a hydrophobic product isn't water-repellent. What is water-repellent then? I would think of something being water-repellent that it's a coating on a jacket that you pour water on and it beads off. That's not the situation here. If you have a mix— That's the only thing that you think would qualify as water-repellent? Off the top of my head, that's an example that I think of. But again, I would like to point out that if you have— Your agent, your hydrophobics, they do modify the original characteristics of the product, don't they? No, the product is silicon dioxide. They're not modifying the characteristics of the silicon dioxide. That silicon dioxide is still SiO2. It's a stoichiometric product. It's a compound. Aren't your silanes coating the surface of the silicon dioxide? No, no, no. They are not coating the surfaces of the silicon dioxide. They are simply bonding. They are lopping off— What's the difference between coating and bonding? I think of a coating as something that doesn't have a chemical bond to the surface. So for instance, if you took shellac and painted this, that would be a coating. And a coating would be a mixture because you'd be able to break it into its constituent groups. That's not what happens here. It doesn't say such products would add water repellent coatings. It just says add water repellent. But again, this is not a water repellent. But tell me again your case that stands for the proposition that the notion of an impermissible impurity is illegal. Well, in the Ruby costume decision—and it has to do with the application issue— Ruby what? Ruby's costume. Is that cited in the law? I'm not sure it is, but it's a— I'm sorry. —337F3rd at 1359. In that case, the case was decided based on whether or not deference would be accorded to some decisions made by Customs. But then the court went on to say, in any event, here's a situation where there was a limiting language and explanatory note, and we're not going to let the court use that limiting language to narrow the scope of the tariff provision. And again, I keep coming back to what is the language that Congress uses? It's plain meaning. It is unqualified. Excuse me. Are you suggesting that one of these explanatory notes is illegal? I'm not saying it's illegal. I'm just saying that you should give it no weight. I mean, if we apply the explanatory note, right, the way the government suggests, then you have these chemicals that have impurity. And the fact that they have impurity doesn't disqualify you from 28. So the untreated SIO2 has in it a permissible impurity on the surface. The passive muster product assumed has an impermissible impurity. It seems to me that if the Chapter 28 note provision in 1A that the government is talking about is valid, then from my line of view, you've got a problem. You're telling me that because the definition of a separately chemical that's a separately defined chemical, whether or not containing impurities or passive, any impurity has to be permissible. Well, Your Honor, that's how I read the language. Now, I have a hard time using the word permissible. I'm a little sort of taken back by an argument that you make here in oral argument based on one of our precedents that note 1A creates an unlawful category, i.e., impermissible impurity. Well, we do say in our brief that the language of the statute is clear that it includes all forms of impurities. Well, okay, let's drill down. Let's look at impermissible versus permissible. I mean you've already discussed the fact that it's not the byproduct of manufacturing process. It's also not rendering the use a specific rather than a general use. You haven't explained that the surface activity, the untreated ethyl alkyl is not a result of the manufacturing process. Well, because the silicon dioxide is already manufactured. The silicon dioxide is manufactured. It comes off the manufacturing process. At that point, those valences start to fill. All deglucid does is it takes – it goes in and reacts to the styrene. They start to fill during the manufacturing process? No, they start filling after the manufacturing process because that's how they fill in nature. So the manufacturing process produces something that has these holes in it, if you will, right? The manufacturing process produces silicon dioxide and has a byproduct of water and has a byproduct of hydrochloric acid. That's what you get when you mix silicon dioxide. At that point in time, those outer valences start filling. And in this case, they start – they start – Well, you wouldn't have silicon dioxide, would you? Yeah. Remind me again. I just want to make sure I understood your argument about the water repellents, right? Are you saying the use of silanes – I'm probably saying that wrong again. Are you saying the use of silanes does not make chemicals water repellent? The use of silanes in this case is not making the separate chemically defined compound water repellent. In this case, I mean, is the use of silanes in other cases? You know, I'm not a chemist. I don't know how silanes are used in other cases. But I know in this situation, this product is not a water repellent. You could put this in a mixer with water. Would it surprise you to know that DuPont, Dow Corning, Dynasilon, all of their websites have information on silones. They said they're used to make products water repellent, but that's their use is to make hydrophobic. And then they actually say IE water repellent. All these websites of all these chemical companies define the use of that product as making a water repellent. I realize it's not record evidence, but I was curious because I don't know what silanes are. Your Honor, I'm focusing on what this product is. And this product, if you put this in water with a mixer that created enough shear, it would go into that water. And also, for years there was no hydrophobic product. So part of it probably is because the judge below disagrees with you. If you look at page 11 of the opinion where the government trotted out its YA argument. And the trial judge, they argued government argument here. The carbon-containing YAs have been liberally incorporated and left into the view. And they're particularly suitable for specific use just for concurrence. Right? But then the judge also goes on to say – he doesn't say any words in there. Nobody said any concurrence. And then he said, but that legal argument is insufficient because there are three categories of exclusion. And this particular product doesn't want to look at it. Let's assume that that argument didn't carry the case. His next argument, the reason for rejecting the 1A argument, the impermissible impurity argument, is to say, well, there's been testimony here that the bulk and essence of each of the patterns are SI from 2, except for the chemicals. So he's saying all you look at here is the surface. Yeah, exactly. And again, that's how he construed the reference to separate chemicals. So this brings us back to the question of whether or not the law in class chemistry factually never looked at the surface. Yeah. Is the customs have found that? Well, yes, absolutely, Your Honor. Why? Because again, well, the tariff is drafted. Congress is presumed to know the language of commerce and the language of science when it drafts the tariff. And again, that's black-letter law. And we cite the Niles case – Niles trading case in our brief to that point. But this again – this is how Congress drafts these tariff provisions. They're supposed to reflect what's going on in nature and what's going on in commerce. But this isn't what's going on in nature. You've added something to the molecule. But the point on this is that when scientists are presented with an inorganic material and are said, what is this? They analyze the bulk of that matter, and they don't concern themselves with the surface. Because to determine whether something's a compound, they have to ascertain whether or not it's stoichiometric. And what's occurring at the surface, whether it's occurring naturally or occurring because of an additional exposure to a reactant, it's irrelevant for purposes of determining what it is that's before you. Now, this is silicon dioxide. There's an E-anomaly tariff provision in Chapter 28 for silicon dioxide. There's no reason to exclude this product from the scope of that E-anomaly provision. I think I've tried to keep an equal time. I think, in total, Mr. Straffer's going to have another six minutes, and I think that's about where you are. So I think we'll have to ask you to step aside. Your clock isn't working here, by the way. Right. There's no – I know. Okay. That's unfortunate. No, no, obviously, I've been keeping – you've had an additional six minutes, which is about the same as his. Thank you very much, Governor. Thank you. Mr. Straffer said you have your full five minutes of rebuttal. Thank you, Governor. Let me address first the water-repellent question. On page 707 of the Joint Appendix, the Caduceus states, all the latter, the hydrophobic types of aerosol have an R in their nomenclature. The ones we're talking about here are R, H72, R, et cetera.  Page 707. What are you talking – R? In 1.2 – I'm retreating probably to what you're talking about. 1.2.4, and that first paragraph of that subparagraph, it says – this letter R is taken from the word repellent. Where's the – This is on page 707 of the appendix. Okay, at the end of the first paragraph under 1.2.4. Right, and it says don't confuse it with the registered trade part. Let me ask you, Mr. – But also – Let me ask you, you note this point. You know that page 25 of your brief, this section of the note that refers to water repellents are excluded. Yes. But it did seem to me – I mean, it struck me that this was a point that you would have given, I guess, more prominent billing to. It was almost just sort of a – I'm not saying your argument is right or wrong, but I was surprised that you didn't give it more attention because just on the surface of it – and Mr. Van Arnam has responded to it – on the surface of it, it seems to be a compelling point, but you didn't really argue it much in your brief. Why was that? I believe it is significant, Your Honor. The trial – we did not go into detail on that issue. We could have, but we didn't. And it was only – It's a kissing peasant to your 1A argument out of that Chapter 28. That's from the explanatory notes from Chapter 28, Note 1. And the entire page at – starting at page 259 of the explanatory notes, and on page 261 of the explanatory notes, the entire page is devoted to Chapter Note 1. And that's one of the – such products with added water repellents are, on the other hand, excluded since such agents modify the original characteristics of the product. Your adversary argues that the definition of a separate pinnacle says separate pinnacle whether or not containing impurities. Right. And there's nothing in that language that says containing permissible impurities. It just says impurities. So he argues that the Note 1A, upon which you rely, is really not property because of the Rudy Costner case. This is a product that contains – Your Honor, what's your answer to his legal argument? He's saying that, you know, advisory notes, so to speak, can't limit the scope of what the statutory recommendation is. Well, in fact, the judge devoted about two pages to citations for cases dealing with the fact that explanatory – Are you familiar with the Rudy Costner case? I'm not. I'm not in any great detail, Your Honor. I think it dealt with customs for whether they were clothing or whether they were other kind of articles. Well, if we had a case, for example, that said it's against the law or an explanatory note to narrow the reach of the statutory category, wouldn't that impair your case? I would think that would be very surprising, Your Honor, because – But if it were so, it would be – it would impair your case. Well, the – Would you say that the explanatory note maybe further defines the word impurities? That's what it's doing here because it's not defined in the statute, the term impurities, and the explanatory note is attempting to put some flesh on that. I realize that that's what's going on. You say, well, the agency ought to be entitled to have some definition. All I'm saying is that there were a case out there that said when Congress says separate, technical, including impurities, and the Congress didn't decide that there was a distinction between permissible and impermissible, that you couldn't buy this plan to narrow it, you'd be in trouble. What the Congress has done – In fact, if so, this would have been – the case would have been over a long time. Your Honor, if I could draw your attention to the chapter note – the rest of Chapter Note 1. For instance, Chapter Note 1D, this is a note, an explanatory note. You can have an added stabilizer added, including anti-kicking agent necessary for the preservation and transport. And 1E, you can have added anti-dusting agent added to the product provided that the additions do not render the product particularly suitable for specific use rather than for general use. The explanatory notes for Note 1 go into that in more detail in saying something like, well, you can add oil to the chemicals so it doesn't let out pores in its fumes. Mr. Chairman, I think your time is – I've tried to keep it equal. I think you've had maybe a teeny bit more than Mr. Van Arnam, but I think it's basically been about the same. So we'll have to bring things to a close. And the case is submitted.